Good morning, Your Honor. My name is Edward Anderson. I'm counsel for the Plaintiffs and Appellants, ITN Flix, LLC, and Gil Medina. I'd like to reserve three minutes of my time for rebuttal. Yes, certainly. Thank you, Your Honor. I've had the privilege of getting to listen to the prior five cases and oral argument on those, and it's clear to me that the panel is generally very well prepared and has read all the materials on all the cases. There's a lot of material on this particular case, so I tend to think it might be the best use of time for me to, rather than summarize the case, to ask if the panel has any questions. Start by addressing those. Anyone have any particular questions? No, I think we do. You're correct. We have read the briefs and the record and have, I think, probably been able to make a decision based on the briefing and the record. But if there's anything you'd like to add to those. I think there's been a lot of claim narrowing that's gone on during the briefing, so I think it's probably worthwhile to clarify that what my clients would really like to do is to be able to go back to the trial court, file an amended complaint, where they would pursue claims for tortious interference with contract and tortious interference with prospective business relations as to both the Hinojosa defendants and the Rodriguez defendants, and then also pursue a claim for negligence against Hinojosa and the other claims they would not be interested in pursuing. So that's the claim narrowing that they would be interested in doing on amendment. Okay. One question. In doing so, would there be a necessity for a finding that there are duties owed to third parties by talent agents? I thought that you made that assertion with respect to Hinojosa, and I didn't know whether there was authority for that proposition. Yes, I understand the question, Your Honor. In the complaint as originally pled, there's two kinds of duties that the plaintiffs asserted that Hinojosa would owe to them. One of those sets of duties would be to inform third parties, such as Mr. Rodriguez, when Ms. Hinojosa was negotiating, for instance, for the machete contracts, that there was a relationship set of contracts between Mr. Trejo and Mr. Medina that Mr. Rodriguez should be aware of and that he might need to take into account as he structured whatever deal he wanted to make with Mr. Trejo. So that's one set of duties. And then there's a second set of duties that relate to Ms. Hinojosa's duty to correct misstatements or to speak candidly when, in this case, as the facts are more fleshed out, a social media agent or Ms. Hinojosa herself made statements to the Wozniaks, Janet Wozniak specifically, by telephone. And Steve Wozniak, perhaps through Facebook, that essentially to the effect that Mr. Medina was a con man, that the film that he was developing and producing with Mr. Trejo was a scam and that he had no relationship with Mr. Trejo at all, which, which... Well, I think that, remind me, you never had an opportunity to amend the complaint in this case, is that right? That's correct, Your Honor. So even if we grant you the relief that you're seeking for, which is to have another shot at it, some of these theories that you've asserted in these claims are extremely broad. For example, the claim that you were just discussing, the negligence, because a business doesn't owe a duty to prevent financial losses to third parties. That's not the sort of duty that's supported under the law. And there are a lot of claims based on these contracts, which I'm not even sure they're enforceable. I can't tell from the master licensing agreement who is the transferor, who's the transferee, who's supposed to pay the consideration. It's, the contract seems to be a jumbled mess. So if you go back, my suggestion would be to kind of figure out what you do have. Otherwise, you might end up being back here again appealing another 12B6 dismissal. Well, the general advice seems very wise from Your Honor. It's part of the reason why we've engaged in some claim narrowing in this appellate process. As to the specific question about the duties of Hinojosa, I think we would not pursue the first part of the duties with respect to arguing that Hinojosa owed a duty to disclose to Rodriguez, partly because on the facts, I don't think they're necessary. Either Mr. Medina is going to win and Mr. Rodriguez knew that already, or he's not. What about the Wozniak? What about them? I'm sorry, Your Honor, I don't understand the question. You were saying the relationship between Hinojosa and the Wozniaks or certain representations that were made to the Wozniaks. Yes. The best argument I think I can make on that on amendment is that the relationship that Hinojosa had to Medina Trejo and the film itself was beyond just Trejo as an actor. He was also a producer on the film, and she had a long relationship with respect to this project. It started before the film was even shot in 2005, and it went all the way through to 2012. And so she was well aware that there was very much a relationship between Mr. Trejo and Mr. Medina. Whether or not parts of it were enforceable or not, the relationship was very real and it existed. It wasn't a scam. And with respect to what she did on the film, Trejo did things like he helped hire actors for the film, like Jason Mewes, and he used Ms. Hinojosa to do it. And Ms. Hinojosa also from time to time, at least there's at least one incident of this in the record, Ms. Hinojosa took inquiries of interest about the film from distributors and she passed them on to Mr. Medina. And she also gave comments on the film. She gave creative comments on how to edit it and how to market it. So the argument we'd make is under those circumstances, when someone like a Mr. McArdle, who was the social media agent, who possibly posted something on Facebook to the Wozniaks saying that Mr. Medina was a conman and the film wasn't real and there was no relationship with Mr. Trejo, when the Wozniaks call her and call Ms. Hinojosa to confirm whether this is true or false, that it was at least negligent by her not to correct that. It may also be an intentional torture case. So she made these statements that he's a conman and whatnot, and I suppose the theory, if I recall correctly from the complaint, is that the Wozniaks then withdrew from engaging in marketing and promotional efforts, right? That's right. Is that the theory? Yes. But there isn't any allegation, as far as I can tell from the complaint, that the Wozniaks even promised to do promotional marketing and all that. So there's all kinds of defects there, too. They didn't have a contract to do marketing. That's true. But I do believe that there's sufficient facts already alleged in the complaint and the materials that are there that very much could be alleged that if it needed to be with more specificity, that there was a reasonable expectation of prospective economic advantage, that the Wozniaks would, in fact, promote the film. There are e-mails from Janet Wozniak to Mr. Medina where she is interested in posting the app and the Wozniaks' participation in the app on their own Facebook pages, for instance. So that they're interested in doing that, that's there, and that's something that is a prospective economic advantage that the plaintiffs argue had value, and the Wozniaks are interesting people. And there was coverage in the press of the fact that this app came out, and it was tied to the movie. And the argument is there would have been more, and it was a platform release, and they would have supported the film. So that's the argument. But it was not a contract. Your Honor is correct. There was no contractual promise by the Wozniaks to necessarily do anything. It was a prospective economic advantage. Thank you, counsel. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, Thomas Baraki. I'm appearing today on behalf of Gloria Hinojosa and her talent agency. Joining me today is Mr. Weiner, who is counsel for Mr. Rodriguez and the related production entities. We've decided to allocate our time nine minutes to myself and six minutes to Mr. Weiner, if that's acceptable to the Court, and I'll try and keep track of the time myself. As the Court is well aware, what we're talking about here today is an appeal of granting of a motion to dismiss the entire complaint without leave to amend. And I'm going to argue first that the trial court got it right in granting the motion to dismiss, and second of all, under an abuse of discretion standard, that the trial court was correct in denying leave to amend. All right. So let's say that we agree with you that the district court got it right on the 12B6 ruling. The right to amend is pretty liberal, and the plaintiff hasn't had that opportunity to amend before. The first point I would make, Your Honor, is that this is, in fact, the fourth complaint that the plaintiffs have made. These same claims, substantially similar, same parties, same grabment, sometimes the exact same claims, were brought in Utah in federal district court, and they were dismissed. There was a first amendment complaint in Utah that was then dismissed, and there's also been an arbitration of these same claims. So this isn't the first bite at the apple that the plaintiffs have had. There has been ample opportunity and extensive briefing over a period of years related to the deficiencies in the claims. Does that per se mean that any amendments would in and of themselves be futile? The fact that they've had various attempts does not mean per se that any attempt would be futile. However, given the facts and circumstances of the particular allegations that have been made, the trial court was correct in concluding that there's no way they could amend those claims to establish viable claims going forward. It just isn't possible given the facts that have been alleged. And we also need to consider carefully, of course, we're reviewing the denial of the motion to amend on an abuse of discretion standard, right? And so under Harmon v. Athol, which, of course, we cited in the briefs, in this circuit, reversal is proper only when the appellate court is convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances. And even if the district court got it wrong, decided on the wrong grounds or made errors of law and fact, if they didn't go so far as to go beyond the pale, a reversal isn't justified. And if they decided on the wrong grounds, we know from Evans v. Charter that that is acceptable, too. This Court has the ability and the authority to affirm based on any grounds in the record. Was the dismissal in the Utah District Court pursuant to a motion to dismiss for failure to state a claim that was filed by defendants? The rationale behind the decision in the Utah court was lack of personal jurisdiction, though there were other – the motion to dismiss was broad, but the actual grounds for the dismissal were lack of personal jurisdiction. And the claims were attacked under a motion to dismiss on the original complaint in Utah, and there was an amendment, a First Amendment complaint that was brought. So while the actual reason for the dismissal in Utah was ultimately personal jurisdiction, the matter of the sufficiency of the allegations was briefed and was addressed extensively. So I think it's important to take note of the claim narrowing, and so I want to spend some time talking about intentional interference claims, because that seems to be the area where the plaintiffs are focusing, and if there were to be an amendment, those are the claims that they would be amending. Before I do that, I want to spend just a minute talking about the master license agreement and the acting agreement. The scope of those agreements is very broad. The master license agreement covers Mr. Craho's entire right of publicity, his name, his likeness, his photograph, his signature, his voice. It covers the world. It covers all goods and services related to that. The term is for eight years. The court was correct in finding under Business Affairs Code 16600 that it is over broad and unenforceable restraint on Mr. Craho's profession. I would note that that agreement is interpreted to be interpreted under California law. The court decided under both California and Utah law, but it's under California law. I would also note that there is a provision in that paragraph, excuse me, in that agreement, and it is 7C, that there is no liability to either party for indirect consequential damages or lost revenues or profits. Let me ask you this. Just because the MLA restrains Mr. Craho's trade, does that aspect of the MLA vitiate the entire MLA? In this case, it does, because that is the heart and soul of the agreement. That's what the master license agreement is all about. So if one were to sever an objectionable portion, say take out the eight-year term, well, you're left with no term. How does that work? If one's going to sever, how do you sever all goods and services? It's really a single-purpose agreement. And the same holds true for the acting agreement. It's only six paragraphs long. The restrictive covenant, which is objectionable, restricting Mr. Craho's right to play vigilante characters or to play in other similar films, it's in the one single paragraph that is operative. It's in the first paragraph. We wouldn't be severing provisions of the acting agreement. We would be parsing the single most important paragraph. And it's inappropriate to do that. Let me turn briefly in my last minute and a half to the intentional interference claims. And I think it's really important to note that what the trial court did, the only agreements that they claimed to have, claimed to exist were described by the plaintiffs themselves as potential agreements with theatrical distributors who are unnamed. That's speculative under Bell Atlantic v. Twombly. It doesn't rise to the level of an enforceable, to a relationship that would be appropriate for this claim. And then their purported realistic expectation of earning millions of dollars in revenues from the app and the film, those are just conclusory allegations. We need to look carefully at the complaint itself. The allegations are in paragraph 57, 58, 60, and 61. In 57, Ms. Hinojosa and or Mr. Rodriguez are supposed to have said to Mr. Wozniak or his wife, perhaps, that Mr. Trejo didn't have a contractual relationship or business relationship with Mr. Medina. That's the view of Ms. Hinojosa. That is not incorrect. She also is accused of saying that they hadn't worked together in ten years. The record reflects that they might not have worked together in five or six years. But it's not a sort of material misrepresentation which is going to give rise or should give rise to tort liability. In terms of the statement about fraud or con man, it seems to be suggested by plaintiffs that that might have been made by a social media agent, McCardle, on Facebook, and that Ms. Hinojosa somehow didn't dispute it. Again, these are such speculative and remote allegations that they, regardless of how they're pled, the conduct which is alleged to occur just doesn't give rise to tort liability. And in conclusion, I will point out that in any event, as Justice Wynne, you noted, both Mr. Wozniak and Mr. Trejo were in the game. The app was featured in the App Store. It just didn't sell well. The film, Vengeance, was released with Mr. Trejo in it. And there's no allegation that Trejo failed to support the film. And finally, the harm that's alleged to have occurred, which is Mr. Wozniak scaled back his support. He didn't have a contract to support. There's no specific allegation or evidence of a particular arrangement. And the harm that's alleged to occur, the millions of dollars which weren't realized, the complaint itself says in paragraph 63 that it wasn't just Wozniak's pulling back of effort that caused the harm. It was that in conjunction with Mr. Medina's own failure to move forward fully with building a social network and his inability to release Vengeance again in 2013. Collectively, there is no way to amend those allegations in a way that would sustain a viable cause of action. And the trial court not only got it right, but did not abuse its discretion in reaching the decision not to grant leave to amend. Thank you, Your Honors. Thank you. Good morning, Your Honors. My name is Joel Weiner. I am the lawyer for appellees and cross appellants, Robert Rodriguez, and related production companies, Machete Kills, Troublemaker Studios, Quick Draw Productions, and El Chingon. May it please the Court. The district court correctly concluded that the complaint fails to state a claim. That was clearly set forth in the district court's order. Mr. Brackey's covered it in this extensive briefing. I will not repeat. I would like to make three points this morning. The first point is my client, Mr. Rodriguez, is two steps removed from the core dispute in this case, which is essentially a dispute between the plaintiff and actor Danny Trejo over the jumbled contracts that they entered into with each other. You represent Mr. Rodriguez, right? Correct. And so you're on the anti-SLAPP motion? Yes, I am. The district court analyzed it as a 12-F motion to strike. Isn't that error? Don't we need to send that back for a proper analysis under anti-SLAPP before we can even get to the attorney's fees? I think so, Your Honor. I think what the court should have done is evaluated the anti-SLAPP, decided whether the claims fall within the statute. If so, struck those claims and allowed me to pursue my attorney's fees. If there are any claims that did not fall within the anti-SLAPP, those claims should have been dismissed on 12b-6 grounds for the same reasons that are set forth in the court's order. And now I suppose the court, this court, could conclude that, you know, the court sort of essentially did a 12b-6 with my claims, and that should be the end of it. That would be one way to go. And the other, I just think the court should have gone one step further and sort of parsed out and said, yeah, everything is dismissed, but some of these claims or all of these claims fall within anti-SLAPP, and I should be able to get my fees on that. We cited the Silverton case that permits a court to, a district court to grant a 12b-6, even though one particular defendant didn't make the motion, if all the defendants are similarly situated as to that particular issue. But I do think that we should have been given an opportunity to get our fees in this case. But we wouldn't decide the anti-SLAPP analysis in the first instance. We'd send it back for the district judge to take another crack at it. You know, it's a de novo review, so I suppose you could do it, but you could also remand it and let the district court take care of it. So continuing with my, with the first point, Your Honor, which was. But do you still want to pursue your anti-SLAPP remedies? I would like to pursue my claim for fees, Your Honor, yes. I mean, I don't want to open the case up and then have the case go on and on, on the merits, you know, but I am entitled to fees. Frankly, if the plaintiff had just sort of let it go and not appealed, I might have let it go as well. But statutorily, I'm entitled to my fees, and so I would like to pursue them. Okay. So anyway, the only factual allegation in the case, in the lawsuit against my client, is my client is a well-known movie producer that cast Danny Trejo in the lead role in the Machete films. And somehow by doing that, it interfered with his exclusivity arrangement and he jumbled contracts. And that's really the only allegation against my client of any facts, because the rest of the claims are just conclusory allegations and theories. There's an allegation that my client conspired with Hinojosa or pressured unspecified people, but there are no facts alleging the complaint that my client did anything other than cast Mr. Trejo in the Machete movies. So you don't take the position as Mr. Brackey that there can be no amendments to the complaint that would make the complaint viable, because conceivably some facts, if they exist, could be alleged implicating your client? No, I don't think so, Your Honor. Those facts just don't exist? Those facts don't exist. And as Mr. Brackey said, there's been ample opportunity. This case was filed in Utah against my client as well. There's been this arbitration going. And then there was a briefing below and there was no showing of any offer of proof to the district judge as to what they would allege against my client that they haven't already alleged. And so literally all they've got is, you know, my client filed a declaration on the anti-SLAPP basically saying, this is why I chose Danny Trejo for this particular project and my creative vision for the movie. And I have no idea about any of these other alleged exclusivity, jumbled contracts, or anything else. And the response was a lot of pages from the plaintiff of irrelevant material about his relationship with Mr. Trejo, and nothing about my client essentially other than they were introduced at a film festival 10 years ago and that sort of thing. So I don't think there are any other facts that are coming forth or that could be alleged, Your Honor. And I think, you know, my client really is alleged to do nothing else other than hire Danny Trejo. And he's engaged in expressive acts, First Amendment. We want to encourage that. We don't want to chill that. And there's just no basis to drag him through further litigation on this. This arbitration, is it concluded? Your Honor, I'm not a party to the arbitration. That was my next question. You're not involved in the arbitration? No, not at all. That's between Mr. Trejo and the plaintiffs and persons other than my client who have nothing to do with it. Thank you, Your Honor. Thank you. Just quickly, this is in the record, but there's a lot of references to the contract being jumbled and confusing. The documents that were signed were signed in 2006, and there were at least six years more of business relationships between Mr. Trejo and Mr. Medina after that where they modified the contracts or certainly could be alleged that they did, and they performed them. So the two of them knew, at least to some extent, what they intended under those agreements, and they performed under them. Mr. Trejo benefited from them, and so did Hinojosa. With respect to the film release, there's also some confusion about that. The 2006 film was a film that was released in test markets. It was a version of the film. There was substantial work on the film done later, so the film that would have been released in 2013 was substantially different, and it was never released. So there's no record of how it would have done or not done, other than the offers that Mr. Medina obtained after there was no marketing support for the film. With respect to no allegation of a contract to market or support the film by Mr. Trejo, that's just incorrect. The acting agreement itself says that Mr. Trejo agrees to support the film. There's also allegations in the complaint itself that Mr. Trejo has an affirmative allegation to support the film. As to the anti-SLAPP issues and what the gravamen of the complaint is about, Mr. Rodriguez is not being sued because he cast Danny Trejo in the sense of that being the culpable conduct. That is part of the story. It's the motive for what happened, for why Mr. Rodriguez is being sued. But why he's being sued is for interfering with the marketing and release of Mr. Medina's film with Mr. Trejo. Mr. Medina had already gotten past the fact that Mr. Rodriguez cast Trejo in Machete and Machete Kills, and he decided instead of suing to compete. With respect to the facts about what Mr. Rodriguez did and whether there could be additional facts alleged, there's a deposition from Ms. Hinojosa in the arbitration where, among other things, she produces an email from Mr. Rodriguez's producing partner, Aaron Kaufman, where he appears to say that he thought that Hinojosa was handling the issue of a competing release of the film by Mr. Medina and Mr. Trejo competing against Machete Kills. Ms. Hinojosa's explanation for that in the deposition is that it was about the fact that there was a machete in the hand of the character in the app. One problem with that is that the explanation comes a month after Mr. Medina had already obtained a license from Machete Chop Shop, which held the ability to license the use of the machete, so that issue had already been dealt with. And then we have a witness who's in the anti-slap materials, Danan Jones, also goes by Danan Smith, who testifies that Trejo told him and Hinojosa told him, told Mr. Smith, who's a co-producer on the movie, that Rodriguez told Mr. Trejo that he could no longer work with Mr. Medina not only on the film, not only on Vengeance, the film, but also couldn't work with Mr. Medina anymore, or Mr. Trejo interpreted it this way, also not to work on the separate relationship they had with respect to Mr. Medina doing things like arranging commercial appearances for Mr. Trejo with respect to Fusion IO and others. Finally, with respect to whether there's agreements that are only potential, that's not true in the complaint. There's an agreement with React Games that's alleged, and it's in the record on the anti-slap that it's a signed agreement, it's a binding contract. That was for the app, and the performance of the app, the contract depended on how much money would be made on the contract depended on how well the app performed, so that contract was interfered with. It's an actual contract. That's all I have. Thank you, counsel. Thank you. Case just argued will be submitted.
judges: Reinhardt, Nguyen, Marbley